hWOODAED, Judge.
The sole issue presented by this appeal is whether the trial court erred in adjudicating this child in need of care and in ordering that she remain in the mother’s custody, but under the state’s supervision.
Finding the evidence insufficient to support the judgment, we reverse.
FACTS
H.P. is a three-year-old girl, living with her mother, Sandra Haynes, in New Iberia, Louisiana. On March 3, 1998, someone, believed to be a neighbor, called the Office of Community Services of Iberia Parish (OCS) and reported suspicions of neglect and abuse of H.P. The report specified concerns for malnourishment; dogs eating in the same pots as humans; lack of proper grooming and clothing; lack of hygiene and cleanliness; more specifically — presence of dog feces, urine, and vomit on the floor of the house; and verbal abuse.
^Pursuant to the report, Ms. Janet Thomas, an OCS worker, visited Ms. Haynes on March 4, 1998. Upon entering the house, she observed animal feces, vomit, urine, as well as pots and dry dog food scattered all over the kitchen floor. Ms. Haynes claimed that the mess was the result of a dog contracting parvo virus. She stated that she had found the mess the night before and started cleaning it, but that she had spent the night at the veterinarian’s office and that she had to get some sleep before thoroughly cleaning the house. Ms. Thomas decided to pursue the investigation and requested that H.P. be examined by physicians. In March of 1998, physical examinations of H.P. were conducted by three physicians, using OCS forms provided by Ms. Thomas and containing specific allegations of neglect/abuse.
Later in March of 1998, Ms. Thomas attempted several unannounced visits to Haynes’ home, but was unable to get into the yard because of a padlock on the front gate and barricades at the back door. Ms. Haynes explained that she kept the yard locked to prevent the dogs from escaping and to protect H.P. from risks inherent to the neighborhood. Ms. Thomas also stated that Ms. Haynes did not have a telephone and did not respond to certified mail. Ms. Haynes explained that she did not claim the certified mail in fear of creditors.
On March 27, 1998, Ms. Thomas requested help from the New Iberia City Police to enter Haynes’ yard. Ms. Haynes answered the door. Ms. Thomas stated that she stayed on the front porch, but she peeped into the house and noted that it seemed adequately clean. Further, she acknowledged on cross-examination that Ms. Haynes’ explanation regarding the reason for the untidiness of the house on March 3, 1998 was possibly true. Finally, Ms. Thomas acknowledged that she had been removed from the ease upon Ms. Haynes’ request and that the *548 case was transferred to Lydia Daigrepont in OCS’ family unit.
On April 13, 1998, the state filed a petition for Child(ren) in Need of Care, charging Ms. Haynes with neglect pursuant to La.Ch.Code art. 606. Consequently, on May 6, 1998, Dr. Henry J. Lagarde conducted a psychological evaluation of Ms. Haynes. Dr. Lagarde found that she presented no signs of psychopathology, that she appeared as an independent woman trying to impress others as being able to handle adversity on her own, and that she had the capacity for adequate interpersonal relationships. Dr. Lagarde found no signs of potential for physical abuse, but noted that she could sometimes express her anger suddenly without warning as a result of bpent-up irritation. Dr. Lagarde recommended monitoring the care of H.P. at home and at the babysitter’s home to ensure that her health and emotional safety are secure.
Additionally, Dr. Lagarde conducted a psychological examination of H.P. on May 15, 1998. He found that she did not present signs of anxiety, depression, withdrawal, or sleep difficulties. He did not perceive her as being overly aggressive or destructive. He also found that Ms. Haynes was in control of H.P.’s reactions. Dr. Lagarde concluded that H.P. did not appear to manifest significant behavioral, or emotional difficulties.
An adjudication and disposition hearing was held on May 28, 1998 in response to OCS’s recommendations for continued supervision of Ms. Haynes’ home and monitoring of H.P.’s physical and mental well-being. Ms. Daigrepont testified that she had visited Ms. Haynes twice recently. Only one visit was announced. She had found the house to be adequately clean each time. She stated that H.P. appeared clean and that she had noticed that there was food in the home. Neighbors, Darren James Daniel (Daniel) and Rocky Salazar (Salazar), both corroborated Ms. Haynes’ explanation regarding the dog being sick with Parvo and both stated that the house is usually clean. Daniel explained that he took Ms. Haynes to the veterinarian the night of March 3, 1998 and that they had attempted to clean the house when they returned. (Ms. Haynes indicated that was approximately 3:00 a.m.) He also testified that Ms. Haynes takes good care of her child and that H.P. is always appropriately dressed.
Father Langlois avouched that he had visited Ms. Haynes socially, responding to her invitation in April of 1998. He observed that the house was reasonably clean. He did not notice the presence of dog feces, or vomit on the floor. He also remembers H.P. as being basically clean, bouncy, joyful, and playful. Mabel Delahoussaye (the babysitter) testified that she watches over H.P. when Ms. Haynes works. She added that the home is usually clean. She also asserted that Ms. Haynes takes good care of H.P. and feeds her appropriately.
The trial court held that H.P. was a child in need of care pursuant to La.Ch.Code art. 606 and adopted the state’s recommendations. The court ordered that H.P. remain in Ms. Haynes’ custody, that the state supervise the home and provide Ms. Haynes with services and parenting classes, and that Ms. Haynes follow the recommendations provided by Dr. Lagarde. Ms. Haynes appeals. We reverse.
JiLAW
Ms. Haynes assigns as error the trial court’s finding that H.P. is a child in need of care, based on grounds of neglect, pursuant to La.Ch.Code art. 606. The sole issue raised by this assignment is whether the state met its burden of proof.
La.Ch.Code art. 606(A) sets forth the ground for a child in need of care as a child who is the victim of abuse or neglect, but La.Ch.Code Art. 606(B) cautions that a child shall not be determined to be a child in need of care solely upon the fact that the parent is unable to provide basic support, supervision, treatment, or services due to inadequate financial resources.
La.Ch.Code art. 603(14) defines neglect as: [T]he refusal or failure of a parent ... to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child’s physical, mental, or emotional health is substantially threatened or impaired.
*549 The state has the burden of proving the allegation of the petition by a preponderance of the evidence. La.Ch.Code art. 665. We analyze La.Ch.Code arts. 603(14) and 606 together and find that the state is required to: (1) prove that the parent either refused or failed to supply the child with necessary food, clothing, shelter, care, treatment or counseling, and (2) show that as a result, the child’s physical, mental or emotional health is substantially threatened.
In the instant case, the state failed to prove each one of its allegations as they pertain to the requirements of the pertinent statutes. The only fact that the state did prove without question is that on March 4, 1998, Ms. Haynes’ home was in disarray when Ms. Thomas came, in response to an anonymous complaint. The condition of the home on that date was explained, with corroborated and unimpeached evidence, as being a singular incident and due to rare circumstances. Namely, the “mess” complained of resulted from the fact that Ms. Haynes’ puppy had contracted the parvo virus. Further, Ms. Haynes immediately remedied the situation.
Proving that a working, single parent’s home was in disarray on one occasion, especially under these circumstances, falls woefully short of establishing that H.P. is a child in need of care under the statute. Further, overwhelming evidence established that Ms. Haynes usually keeps her home reasonably clean and that the home was a safe shelter, though in dire need of cosmetic repairs.
^Similarly, the state did not show that H.P. was either in or close to a state of malnourishment. The testimonies are in agreement that food was always present in the home and that Ms. Haynes kept H.P. “well-fed.” For example, Jayne McCullough, with Sexual Assault & Abuse Free Environment, counseled Ms. Haynes regularly for almost a year and a half, through February 5, 1997. She reported:
I found Sandra (Haynes) to be a concerned, responsible parent who just needed some guidance on specific techniques for discipline and nurturing of her child. I watched Sandra go without basic necessities, while making sure that [H.P. s] physical and emotional needs were met.
Even Ms. Thomas testified regarding her initial contact that H.P. appeared to be “well-nourished” at the time in question.
Moreover, we are not impressed by the probative value of the reports of the three physicians who used OCS forms to evaluate H.P. We find those reports to be unreliable. Based on the evidence presented at trial, they were operating under an erroneous history; none of the reports provide a reasonable factual basis for their conclusions and their conclusions are contradictory and speculative.
For example, Dr. Woods’ report, made after examining H.P. on March 3, 1998, noted that she had an old dog bite on her anterior hip region. From this, he apparently concluded “probable neglect”. However, he also notes that H.P.’s overall health is good. Of particular importance is his notation that he would need old reports in order to fully evaluate the possibility of medical neglect. Yet, OCS did no follow-up with him. In fact, Ms. Thomas admitted that she did not even attempt to contact Dr. Woods to have him explain his evaluation.
Neither of the other two physicians found any indication of neglect. One of them wrote:

No evidence neglect Child clean

Immunizations up to date Child well-fed....
[Emphasis added.] This physician found no injury and concluded that the child was healthy.
The third physician of this group, likewise, found the child to be in good health. He, as well, found no evidence of neglect.
bAdditionally, although some of these reports, as well as others, comment on a lack of discipline, the state did not use discipline as a ground of controversy to prove that H.P. is emotionally disturbed or abused. On the contrary, it introduced Dr. Lagarde’s report which concludes that H.P. did not appear to be manifesting significant behavioral or emotional difficulties.
*550 Finally, the state and the judge’s reasons for judgment seem to rely exclusively on Dr. Lagarde’s conclusion to recommend state supervision. Dr. Lagarde performed a thorough evaluation of both H.P. and Ms. Haynes, using objective testing and interviews. His recommendation comes as a surprise, because he reports that he did not see any major problem with Ms. Haynes. He stated, inter alia:
(1) Ms. Haynes is experiencing stress because of having to fix a dilapidated home and care for her three year old daughter at the same time. There are also financial strictures.
(2) The evaluation indicates that Ms. Haynes should be capable of meeting this challenge....
It is, thus, difficult to reconcile Dr. Lagarde’s finding regarding H.P. and Ms. Haynes’ psychological examinations with his recommendation. Further, we note that approximately one month after his favorable finding concerning Ms. Haynes, he concludes that H.P. “does not appear to be manifesting significant behavioral or emotional difficulties.” This conclusion was based on results from the Child Behavioral Checklist, which he states shows:
No problems on the six scales. [H.P.] is not perceived as anxious or depressed. She is not perceived as withdrawn. She has no sleep difficulties or health problems. She is not perceived as overly aggressive or destructive.
Notwithstanding, the trial court found that based on the evidence, H.P. was a child in need of care. The court did not specify the factual basis for its decision. In fact, we find none in the record. Accordingly, we reverse.
CONCLUSION
For the reasons stated above, the adjudication of H.P. as a child in need of care is reversed.
REVERSED.